Mrs. Bruce is here for the appellants, Mr. Bagnod for the appellee, and Mrs. Bruce, you may begin when you're ready. Good morning, your honors. May it please the court. We've appealed the denial of defendant's motion to dismiss. As your honors know, the district court denied our request for qualified immunity. This case involves a use of force that occurred at the Cobb County Jail on May 28, 2015, between my client, Detention Officer Dilmus Reed and Plaintiff Dennis Quinette. In addition to Officer Reed, this action has also been brought against Sheriff Neil Warren and six members of his current or former command staff. As an initial matter, the supervisory claims against the command staff members and Sheriff Warren are barred by qualified immunity because plaintiff has not provided a clearly established law in which a supervisor was held liable for actions of a subordinate under the particularized facts of this case. Hadn't the supervisors also taken disciplinary actions against the officer in question in the past? Yes, your honor. How does that fit within our analysis, the fact that they had taken some steps? I would fit that in by saying that the clearly established law that's particularized to the facts of the case would need to involve a scenario where supervisory defendants had faced a situation where there was a subordinate who had various disciplinary problems over a period of time and had addressed those in some manner of discipline, and that was found by a court to be insufficient level of discipline. Because what really the plaintiffs appear to be challenging here is the adequacy of the discipline and the training and the supervision. And from a supervisory defendant's perspective in this case, there's not a case that tells them exactly what level of supervision that needs to be, what level of discipline you would institute against a defendant who has, for instance in this case, two use of force incidents over the course of 10 years. Turning to this particular incident, is it your contention that the, that Mr. Cornett was doing anything disruptive or anything that impeded the ability to maintain safety in the jail? Yes, your honor. It is our contention that he was impeding safety because anytime that an inmate puts his hands on an open cell door, I would argue that there's some level of reasonable safety concern. But even... Was the cell door open? Yes, your honor. It had not closed all the way. Okay. Well, I looked at the video and of course Judge Thrash says, the reason I looked at the video because the judge says anybody who looks at this video could come, could not come to any other conclusion other than that this was a gratuitous and malicious excessive use of force. And the video doesn't appear to be, I don't see the door open. He's just, I'm having a hard time determining how security is impaired. He's attempting to get the attention of the officer. It looks like he was banging on the door. Okay. Yes, your honor. He was banging on the door at one point and then when the detention officer comes to the door to let another inmate into the door and he begins to shut the door, if you slow-mo the video, which I would encourage you to do if you haven't yet. I've done it. I suspected you had. The plaintiff raises his hand, touches the door, and then you slowly see, and the door's almost closed, and then you slowly see him extend his hand. And that would support the, I mean, pushing him and causing him to break his hip? That would support the use of force? I mean, the officer can use force, but the law says the officer can't use excessive force. That's what the case is all about, that the officer used excessive force. Yes, your honor. And I would like to make two points quickly. One point would be that the cases don't stand for the proposition that there has to be a threat to security. That is a factor in consideration in weighing whether it was a subjective intent to harm, but there have been cases, including Cockrell v. Sparks and Bennett v. Parker, that are cited in our brief that say that a court, that a deputy or detention officer can use force to maintain or restore discipline or to quell a disturbance, so to speak. But if you just think that an inmate is looking at you funny, I assume you don't think that you can walk in and push them, right? I wouldn't say if an inmate was looking at you funny, no. I'm glad you don't make that concession. But in Cockrell v. Sparks, for instance, the inmate was locked inside a secured cell. The deputy... In Cockrell, an inmate had unsuccessfully attempted to commit suicide. They were trying to move him to the drunk tank where Cockrell was housed. Cockrell began shouting, banging on the door, yelling at the deputies and creating a disturbance. We don't have that here. Well, Your Honor, I believe what happened in Cockrell, if I understood the facts correctly, is that an inmate had attempted suicide. They needed to move that inmate into the drunk tank, so they needed to move Cockrell out of the drunk tank. They successfully did that, moved Cockrell to his own cell, and from inside that locked cell, he's banging and making noise while they're trying to deal with... With his shoe and yelling at the deputy. Yes, Your Honor. However, my point would be that if the deputy in Cockrell could go into a closed cell, tell him to shut the hell up and shove him down, then our deputy could push him back from an open cell. Why isn't this case more like Hadley v. Gutierrez, where we said that a single punch to a non-resisting detainee can constitute excessive force by an officer? You can't punch a non-resistant detainee who's under control, not resisting, and obeying commands. I don't think this is a resistance case, Your Honor, and I would go back to the point of the courts have held. So, for instance, in Cockrell, he wasn't resisting anything and it was found to be unacceptable to go in and shove him down. And so, part of my argument on that would be if... Kind of comes back to my point, which I would like to get to about the extent of the injury. So, you know, we agree that at first glance it would appear that this factor cuts against us because plaintiff was unfortunately very injured. However, the based on this court's precedent that the extent of injury may be outweighed by the officer's inability to reasonably anticipate the severity of the injury. In Cockrell, the court said there was no way, no way that a deputy would have foreseen that a simple push would result in as much injury as the plaintiff unfortunately suffered, which was a broken hip, a broken For instance, the resistance cases where someone is handcuffed and then they are punched. The officer knows that when they punch them, that's going to hurt them. When an officer shoots at a suspect, he knows that if he's successful, that suspect's going to suffer pain. If he pepper sprays him, he knows he's going to suffer pain. In this case, the district court acknowledged and plaintiff conceded in their brief that our deputy may not have known that this result, this injury would result. I want to make sure I understand your position before opposing counsel has a chance to speak. Let's assume that there was that there is no grievous injury in this case. What is what is your position about what it was that justified this use of force? Again, going back to, I believe that when the proper and this is key, when the proper deference is given to what a reasonable officer, because that risk of threat to security is supposed to be perceived from what a reasonable officer in those circumstances would have thought when it's looked at through those eyes, I realized the plaintiff is saying, I didn't actually exert any pressure on the door. I just touched it. But he acknowledges that our detention officer saw his hand on the door. So you're saying that the inmate, the inmate touched the door, that touched an open door, and that's what justified the push, right? Yes. However, even if there was not a threat to security, say that there was not a threat to security, the United States Supreme Court has said that it's the question is, and I'll finish this one point and then I'll sit down, is malicious and sadistic. And I haven't gotten to come back to that point yet today, but I want to end my time now with that. Isn't that the Georgia standard rather than the standard we look at at the federal level? No, Your Honor. This case, because at the time of the incident, the clearly established law was that a deputy that was involved in the... Oh, I see. I thought you were talking about something different. Yeah. Sorry. So the malicious and sadistic standard, which is the one that operates today, is higher than whether it was unreasonable or unnecessary. And it's higher than whether it was deliberately indifferent to if the inmate would suffer injury. It has to be an inmate. And with it being unforeseeable that that level of injury would happen, I just don't see how we get to the level of the shock, the conscience, malicious and sadistic shove. Thank you. I'll reserve my time. All right. Ms. Bruce, you've reserved some time for rebuttal. We'll hear from Mr. Begnock. Thank you. Good morning, judges, and may it please the court. We're asking the court to affirm the district court because we believe the district court got it right and got it and found this attack gratuitous, unprovoked, and malicious. And the district court reviewed Reed's lengthy disciplinary history and found that a reasonable jury could find that the command staff defendants here were deliberately indifferent in failing to take any meaningful efforts to discipline, supervise, or train Reed. And I'd like to begin, like opposing counsel, with the supervisory defendants. And I'd like to focus on the qualified immunity analysis. So in qualified immunity, there are three ways to clearly establish law. There's case on all fours. There's broad statement of law. And there's obvious clarity. The district court below got it right in these qualified immunity analysis in under supervisory liability that there is a broad statement of law sufficient here to put supervisors on notice as to what behavior is prescribed. The district court cites Danley v. Allen, the 11th Circuit case from 2008. This court has long recognized that supervisors are liable for the excessive force of their employees where the supervisors receive numerous reports of prior misconduct of that nature by their same employees and do nothing to remedy the situation. Go ahead. He was fired, right? And he'd been disciplined before. He was formally reprimanded, required to attend training and counseling. He was terminated. I'm not sure how you can support a claim for supervisory liability, given those facts in the record. First, I don't think there's any record of training. I think that the record is that after these repeated incidents, the go-to of the command staff was to give him a verbal reprimand. You have the initial two excessive force incidents. The first is it's not on video, and so it's not founded. The second one's founded, where he puts a guy in the hospital. He slams a restrained inmate into a concrete ground, and the guy has to go get stitches. Just a verbal reprimand there. Don't do it again. After the second incident of excessive force, he again slams a restrained inmate's head into the ground while that inmate is chained to other inmates. There, there's a verbal reprimand and informal counseling, and I think that it would be helpful to do discovery in this case to see what informal counseling means, and I suspect it of inmate abuse from the year before the incident here, where again, the only response is a verbal reprimand, and that's more than 15 complaints by inmates about various types of inmate abuse. We have complaints of religious abuse, where Reed is going and telling somebody, get your Koran out of here, and telling him his religion is using profanity. You have four to inmates in front of other inmates. He's calling them the B word, the N word, demoralizing people, talking about their children. An inmate says, he talked about my deceased father, talked about my girlfriend, talked about my mother, and you also have a lot of instances of abusive behavior. He sends an inmate to a new cell without the inmate being able to take his socks or his underwear with him, just to be nasty. You have him saying an inmate can't use, an inmate has a medical, medically prescribed double bedroll because he has a herniated disc. Reed takes one of those bedrolls away out of spite. You have an inmate asking for hygiene products because he hadn't been able to wash in seven days, or hadn't been able to change his clothes in seven days. Reed's response is, get the F out of my face. This is, and there's more than 15 allegations. This is the year before the incident here, and the only response by the command staff is a verbal reprimand. I think at that point, we don't have any meaningful response to a campaign of inmate abuse, and I think that we also have, at that point, a jailer who has a demonstrated history of violence against inmates. You know, we're talking about two actual assaults against inmates, slamming a restrained inmate's head into a concrete ground on video. That's in the background. Then you've got this campaign of abuse. I think that the facts here track the case that we cite in our brief, Griffin v. City of Opa-locka. That's the 11th Circuit case from 2001, where there is a city employee. The city is held liable because they should have known that this city manager might do something like this, and there, the background is of sexual harassment. There's no violent history there, and there's no criminal history there, but in that case, before the city manager was hired, there were articles, faxes, and mail warning of prior sexual harassment. The city manager was a known womanizer. His nickname was The Penis, and two employees complained about his sexual harassment. Had he ever been reprimanded at all? I'd have to reread the case to see exactly what the response was to those two new allegations of sexual harassment. I think they were probably ongoing at the time. I've got a question for you about the actual incident and the officer involved. His conduct is obviously concerning, but what about the Cockrell case? Does that hurt your argument that he clearly should have known that his conduct was unconstitutional? I think that, obviously, in the excessive force cases, we're looking at the totality of the circumstances, and I think that the fact that this was an open-handed move by Reed does all of the county's heavy lifting for them in their briefing, you know, and I think that that's too formalistic a distinction to make. You know, in their brief, the county talks about how an open-handed shove is a light amount of force. This was not a light amount of force. You know, looking at the video, he steps into this. We're not talking about he's flat-footed and he just pushes somebody back. He opens that door, steps right into it, and heaves my client across the cell. I think that if we are just looking at the open versus closed-handed, a push versus a punch, I think that that elevates form over function, and I think that on a real level that this was a severe use of force, and I would point the court to, I provided a supplemental case that came out since our Lambert, where there's a pretrial detainee who is shoved hard onto a desk and his shoulder pops, and there the court doesn't do an analysis that, well, it's a shove onto a desk, so it's a light amount of force. The court there acknowledges that shoving somebody hard down onto a desk is not a light amount of force, and so I think that that's one very real distinction between our case and Cockrell. Obviously, in Cockrell, you know, the difference is what is the jailer looking to accomplish here? What is the justification for the use of force, which, you know, we're miles away from Cockrell on our facts. You know, on our facts, I take great issue with the characterization of the door being open by the county. That door was closed. That door just hadn't been latched yet. My client's not putting any pressure on it, and if you watch the video, you know, Reed opens the door, lets another inmate in. My client steps to the side to let the other inmate in. My client steps back to where he was with his hand up, and then Reed is closing the door on him, and so my client... Is there any evidence in the record to support that fact, that the door was closed? So, obviously, we're here on a 12B, and so the evidence is what we allege in our complaint. We spell it out pretty clearly in the complaint, I think, that the door had struck the strike plate, and it just needed to be pushed another, you know, millimeter, and then it's closed. So, the door wasn't latched, but the door was closed, and my client is not putting any pressure on it. He's got his hand up as the door is closing in his face. You know, he's standing there with his hand up, and the door is closing in his face, and so I don't think that on those facts there is any justification for any force, because there is no threat. At that point, there is no force. So, for instance, Gutierrez, you know, the Robinson case that I just mentioned, we have a string cite of them in our brief, that an officer is not allowed, or a jailor is not allowed to use force when there is not a resisting individual, or once any justification for the use of force has ceased. You know, the line of cases where you have an inmate who was resisting, stops resisting, and then force is continuing to be used. Here, to the extent that putting his hand up created any theoretical justification for the use of force, by the time Reed reopens the doors, that's gone. There's no justification for him to open the door back up and heave my client across the cell. Obviously, Kingsley abrogated our malicious and sadistic standard. Your opposing counsel said that we should apply that standard, since that was in play at the time of these events. Do you agree or disagree with that? She's right. Okay. Yeah. That said, you know, it is the same factors that is analyzed, you know, that are analyzed in these cases, and I think that walking through the factors pre-Kingsley, and the District Court correctly held, I mean, the District Court applied the pre-Kingsley standard on that point, and correctly held that this was gratuitous, unprovoked, and malicious, and that, you know, the weight of authority supported denial of qualified immunity to Mr. Reed. And the clearly established authority that you're relying upon is Hadley v. Gutierrez? Yes, so the line of, yes, and so the, so I, two responses there, Judge. You know, obviously, there are four ways to clearly establish the law in the context of excessive force. There's a case that's on all fours. There's broad principle. There is, yeah, the District Court here also relied on the obvious clarity rule. Yes, Your Honor. I'm not so sure about that. Okay. What do you have to say about that? Well, I think that the District Court got it right. I mean, the District Court, you know, in a footnote notes that, you know, viewing this video, that anybody would find this to be malicious, sadistic, and unprovoked attack, and I think that, I mean, I think that a juror could find that. If Judge Thrash found that, I think a juror could find that this was malicious, sadistic, and unprovoked as a matter of obvious clarity. How do we factor in the Supreme Court's decision this year in Escondido v. Emmons? The Court said that the clearly established right has to be, quote, defined with specificity and not defined with, quote, a high level of generality. Two responses, Your Honor. First, the specific rule here is that you can't use force once the need for it has subsided, and this Court said in Robinson v. Lambert, and that is a new case, that is a case that is after these recent U.S. Supreme Court cases. But unpublished, right? I don't recall whether that's unpublished or not, but that is the right approach to take, regardless of whether that's published or unpublished, that this line of cases still is narrowly articulated enough. But I have another response for Your Honor, and that's that I'm not sure that that line of cases necessarily should be applied in the context of a custodial excessive force case. Bear in mind that the five U.S. Supreme Court cases that I've found that take this issue on are Fourth Amendment cases. You know, we're talking about police shootings. And in those cases, in the White case specifically relied on by the county, the U.S. Supreme Court says that in an objective reasonableness analysis, we need to be able to give officers on the street the ability to make split-second decisions. Here, on the qualified immunity analysis, as the county meets the standard here, if we meet a malicious and sadistic standard here, then by its very nature, we have satisfied the qualified immunity element. In other words, those cases are an opposite because we have a higher standard here. And we even see that in the history of cases from this court, where pre-Kingsley, if a claim is, if a successful claim is made out that there is excessive liability, that there is excessive force in the context of a custodial incident, we don't even do qualified immunity analysis. The mere fact of finding that the malicious and sadistic standard has been met is enough to establish qualified immunity. Do you think there's any daylight between the pre-Kingsley standard and the actual malice or with intent, or with actual intent to cause injury standard that applies for Georgia official immunity? I will admit, Judge, that I haven't dug into the specifics on, I haven't read all the cases on both, and so I wouldn't, I don't know the answer to that question. I can't imagine that there is. I don't remember seeing in any case law that there ought to be, but I don't know for certain, Judge. I also just, I would like to point out, for your honors, going back to the supervisory liability point, I did provide two additional cases that I hadn't cited in my brief that are other cases where we've got acts by subordinates, and a subordinate is not terminated, and then later on that subordinate commits an offense, and the supervisors are allowed, the court authorizes a case against the supervisors. The two cases that I point to, one is Sims v. Adams, Fifth Circuit case from 1976, where there is an officer who is under investigation for two acts of violence against African Americans, and then commits a third act, and in that third act, the supervisors are allowed to be held liable because there were two pending complaints against that officer. And so we know that two pending complaints are enough to establish supervisory liability. And then there's also the Parker v. Williams case, and that's where a chief jailer is accused of a sporadic history over 19 years of some warning signs. One was a charge of indecent exposure from nine years prior, and then there were three prior mental health hospitalizations, and I think that it sounds like there might be a diagnosis on the schizophrenia spectrum somewhere, and then a history of drug abuse. Can you point us to any cases finding supervisory liability for failure to adequately discipline an officer or an employee, rather than failure to discipline at all? And Judge, I can't, that's not a specific point that I was looking to in my research. If I'm able to find some authority that satisfies, if I'm able to find some authority, may I file just a brief supplemental, application for supplemental authority? It'd be fine, thanks. Thank you, Judge. And for those reasons, we ask that this court affirm the district court. And would you file it by next Tuesday, close of business? Yes, Your Honor. And counsel for Mr. Reed can file something too by close of business next Tuesday, not Dixie, three pages? Yes, Your Honor. Okay. Thank you, Judge. Thank you. And Ms. Bruce, you reserve some time for rebuttal? Yes, Your Honors. One point that was made by Mr. Quinnett's attorney is that the same factors apply to the objectively reasonable test and the malicious and sadistic standard. While those factors are the same, the ultimate question that's being answered is different. It's do the facts related to those factors under Kingsley would be, does that show that it was objectively unreasonable and unnecessary for this level of force to be used? Under our case, the question is, do those factors plausibly suggest, not possibly, but under Iqbal Twombly, do they plausibly suggest that for the very purpose of causing him harm? I mentioned this earlier, but to quote exactly what the plaintiff's counsel said in their appellee's brief, quote, defendant Reed may not have subjectively anticipated this specific result, end quote, but that Reed was, quote, responsible for reasonably anticipating the consequences of his actions. And it is not unforeseeable that throwing a vulnerable older man across a room with a concrete floor could result in serious injury. I would encourage you to consider this, again, based on the high standard, the shock, the conscience, malicious and sadistic. If he didn't intend or foresee that that level of injury would happen, then all that he intended was to push him back with no anticipation of this severe harm. So what was the purpose of his push? There was no malicious and sadistic intent for the very purpose of causing harm when he didn't anticipate that there was going to be any harm. Even, isn't, obviously it would be more minor harm, but isn't, you know, a push is a battery in criminal law, right? A push does itself involve harm, even if the person doesn't surprisingly break their hip. I get mad at my kids for pushing each other, right? Right. I don't think that that level of a push would reach a constitutional violation of malicious and sadistic intent. So if he didn't think that he was going to break his hip, it's okay to just shove him across the room? That's a harm, isn't it? Pushing against somebody and shoving them across the room, isn't that harm? Yes, that may be a harm, but it would be outweighed in a situation like this with the prison context, the volatile prison environment, the deference we are supposed to give to prison officials. Because in my last couple minutes, I'll just say that one of my concerns with this case on a broader scale is that if jailers can't push an inmate back from a door that has not, even by plaintiff's facts, completely closed, if he can't push him... They said it had closed, it just hadn't been latched. So wouldn't an alternative have been to latch the door? Wouldn't it have been easier to push the door instead of the guy? Yes, but again, the 20-20 hindsight, the split-second decision, in that moment, he reacted by, under plaintiff's facts... By opening the door, stepping through, and pushing the guy across the room where he fell and broke his hip. Yes, by, under plaintiff's facts, by reopening the door. Well, it was pretty much closed. I mean, I'm not saying that he unlatched the door, but he had to open the door to get through it, didn't he? He's not skinny that way, is he? No, but our contention would be that our perspective of the video is that that is not what it shows. Our perspective of the video is that it shows that it was the plaintiff's touch that reopened and the deputy reacted to that feeling of the reopening of the door. If this case proceeded to discovery, then we'd have a better idea about whether or not the door was closed or open, wouldn't we? This case was decided on the pleading stage, right? Yes, Your Honor. However... Most of these 1983 claims were in officer claims qualified immunity or decided at the We'd have a better idea about whether or not that cell door was actually open or closed, wouldn't we? We may, Your Honor. However, I would just say that at this stage, the court has to consider whether they've plausibly stated that this was done maliciously and sadistically to cause harm. And if they haven't done that at this stage, then we don't need to open the doors of discovery based on the, you know, everything grounded in qualified immunity. Thank you. We understand your argument. Thank you, counsel. We'll be in recess for 10 minutes.